**BAYSHORE CONSTRUCTORS, INC.,
et al., Appellants,**

v.

**SOUTHERN MONTGOMERY COUNTY
MUNICIPAL UTILITY
DISTRICT, Appellee.**

No. 7804.

Court of Civil Appeals of Texas,
Beaumont.

Nov. 18, 1976.

Rehearing Denied Dec. 12, 1976.

William G. Lowerre, Russell Talbott, Houston, for appellants.

Ernest Coker, Jr., Stephen W. McClain, Conroe, for appellee.

DIES, Chief Justice.

The Southern Montgomery County Municipal District (Referred to herein as District) sued Bayshore Constructors, Inc. (referred to as Bayshore) along with the surety on its performance bond, Fidelity and Deposit Company of Maryland (Fidelity), for the failure of performance in the installation of water and sewer pipes and the resurfacing of roads in the Oak Ridge North Subdivision of Montgomery County, Texas. After a jury trial, judgment was given District against Bayshore and Fidelity in the amount of $111,554 and in favor of Bayshore against the District on Bayshore's counter-claim in the amount of $13,799.20, from which judgment Bayshore and Fidelity perfect this appeal.

■ There are a number of points challenging the evidence to support certain findings by the jury. In passing on no evidence points, we may consider only the evidence and inferences therefrom which tend to support the verdict and disregard all evidence and inferences to the contrary. *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965).

■ When the contention is that the evidence is insufficient to support a fact finding or that the finding is against the great weight and preponderance of the evidence, we must examine all the evidence and reverse and remand for a new trial if we conclude that the evidence is factually insufficient to support the finding of a vital fact or that the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951).

■ The jury found that the reasonable and necessary cost of correcting any defects in the work performed by Bayshore as a result of its failure to perform pursuant to the contract was $111,554, which Bayshore contends is supported by no evidence or insufficient evidence.

J. C. Hild, a registered engineer, drew the District's plans and specifications for the water and sewer lines constructed by Bayshore. Following construction of the lines, and paving of the streets subsidence occurred both over the lines and in the streets. This, Hild believed, was caused by improper compaction over the trenches. To correct this, it was his opinion the entire street area would have to be repaved, not just areas of settlement. He described the process known as "water tamping" in which a pipe is forced through the refilled trench, then water jetted through the pipe until the water reaches the surface. This is designed to cause the refilled trench or "backfill" to settle or compact. He felt all the surface Bayshore had constructed on the streets should be torn up, the trenches water tamped and then resurfaced. To only re-patch the areas of subsidence as proposed by Bayshore would damage the other paving, and prevent uniformity.

Willie Acreman, a road builder, testified the cost to remove the surface material, water tamp, and replace road mix topping would be $208,512. He also felt the whole area needed redoing; otherwise, it would be a "patch job" and water would leak in between the old and the new asphalt. These points are overruled.

The jury found that Bayshore failed to backfill the trenches for the sanitary sewer lines according to the plans and specifications which Bayshore contends is supported by no evidence or insufficient evidence. The jury also found that Bayshore failed to backfill the trenches for water lines in a good and workmanlike manner which Bayshore says is supported by no or insufficient evidence.

The jury also found that Bayshore failed to water tamp the sewer trenches according to the plans and specifications and in a good and workmanlike manner which Bayshore says is supported by no or insufficient evidence.

We will discuss all these points together.

The plans and specifications of the contract between Bayshore and District provided that a water line should be laid on one

side of the street, and a sewer line on the other. This required water trenches of three feet in depth and sewer up to twenty feet in depth, the latter being deeper to provide flowage. The plans and specifications provided that after the pipe was put in the trench, Bayshore was to backfill the trench by hand-tamping up to a foot above the pipe, then to fill the trench with the loose dirt up to the top, then jet water into the trench (water tamping). After the dirt settled, if it had settled more than one foot, it was to be filled again, then compacted by running over it with heavy equipment. The purpose of this is to achieve compaction and prevent voids.

Bayshore got the contract, July 30, 1970; sometime after December 1, 1971, subsidence and deep holes began to appear over both the trenches, and the streets. Pictures introduced at the trial reveal this subsidence to be substantial and general. Hild believed this was caused by improper compaction and a failure by Bayshore to water tamp.

Frederick A. Harris, a Soils Engineer, conducted core boring tests in April and May of 1973. These tests measured the percentage of maximum dry density, which is a test to determine the moisture content and density of the soil. The average original of all bores was 88 percent, which "indicates relatively low degree of compaction", and that it was not water tamped. If a ditch is properly water tamped, one can expect 95 percent to 105 percent maximum dry density. One core detected a five foot void from 6 feet to 11 feet. Water tamping would have eliminated any such void. The cores on both water and sewer lines revealed poor compaction and subsidence will likely continue. It was his opinion water tamping would have prevented the settlements in the ditches.

Two witnesses, Buchanan and Black, employed by the District, testified they never saw Bayshore do any water tamping.

Everett Phelps, general superintendent for Bayshore, testified they water tamped in April 1970 but soon ran out of water supply and had to wait until the new water line was installed before resumption. They completed tamping in four to six weeks— May 15 to June 1, 1971. They requested the District to wait until the following spring to resurface the streets, but were refused. The subsidence was caused by the water they tamped not being properly dried out.

Robert R. McBride, a Foundation Engineer, disputed that the water tamping required by these plans and specifications would do any good to achieve compaction, and in fact thought their tamping would cause greater subsidence.

So, while some of Bayshore's testimony as to the cause of the subsidence was disputed, clearly fact issues were made for the jury, and it was their prerogative to make the choice. These points are overruled.

▇ The jury failed to find that Bayshore's request to wait until the spring of 1972 to resurface the roads was reasonable. Bayshore says the evidence establishes this as a matter of law, or it is against the great weight and preponderance of the evidence. We disagree. The contract called for Bayshore to complete its work in 360 days, before the spring of 1972. Presumably, when Bayshore signed this contract it knew the time involved in water tamping and drying. There was no legal obligation by District to extend the time. Further without a finding of causation, even had this issue been in Bayshore's favor, it would not have changed the result of the case. This point is overruled.

▇ Bayshore contends the court erred in failing to award interest on its counterclaim (retainage) of $13,799.20 from January 1, 1973, rather than the date of the judgment. Bayshore would not be entitled to interest on any sums due it under the contract, until it had fully completed the contract. *Ryan v. Thurmond*, 481 S.W.2d 199 (Tex.Civ.App., Corpus Christi 1972, writ ref'd n.r.e.). See also *Hurley v. Hirsch*, 66 S.W.2d 387 (Tex. Civ.App., Dallas 1933, writ dism'd.). This point is overruled.

Fidelity and Deposit Company of Maryland as previously noted was surety upon

the Tex.Rev.Civ.Stat.Ann. art. 5160 (1971) performance bond to the District and contends the statute of limitations of one year in that article bars recovery against it. The trial court held that Fidelity was liable.

Bayshore finished the contract by December 1, 1971. The District's engineer, Hild, then recommended its Board to pay Bayshore the final funds. On December 20, 1971, the District's Board voted to pay Bayshore these funds. Of course, it never did. The District's original petition was filed October 5, 1973.

Bayshore's contract with the District provided:

"The Contractor shall remedy any defects in the work and pay for any damage to other work resulting therefrom, which shall appear within a period of one (1) year from the date of final acceptance of the work unless a longer period is specified."

Fidelity's bond specifically makes this contract "a part hereof", etc. This would, of course, include Bayshore's above one year warranty.

■ Tex.Rev.Civ.Stat.Ann. art. 5160 (1971), in part, provides: "No suit shall be instituted on the performance bond after the expiration of one (1) year after the date of final completion of such contract." This contract could not be "finally completed" before one year after the final acceptance of the work. The contractor had agreed to correct any defects which would appear within one year from the date of final acceptance. That provision was clearly a part of this contract, and its meaning is unambiguous. To give this contract and statute the meaning Fidelity wants us to give them would not allow the District time to file a suit if the defects appeared at or near the end of the one year "remedy" period. We construe art. 5160 to mean that a person in the position of the District in this case has a full year to file suit after the one year "remedy" period has elapsed.

Our interpretation as to the present meaning of art. 5160 is strengthened by a study of this article before its amendment

in 1959. Before this amendment, this statute also contained the words "and final settlement" of the contract. The legislature removed those words from the amended statute. We conclude the logical reason for this amendment is to eliminate an argument as made by Fidelity in this case. The "final settlement" date no longer is the important criteria, but the "completion of the contract" is now the determining factor.

Fidelity cites *City of Midland v. Waller,* 430 S.W.2d 473 (Tex.1968), as supporting its position in this case. The factual situation in *Midland* was not the same as the one before us, and any statement as to the law of that case would have to be dicta as to the case before us. In *Midland* suit was filed *more than two years* after acceptance of the work. *Both* the one year for remedial work to be done and the one year statutory period had elapsed before suit was filed. In the case before us the one year for remedial work to be done had passed, but the additional one year statutory period had not. Fidelity's point is overruled.

Bayshore has other points which we find have no merit, and they are all overruled. The judgment of the trial court is affirmed.

AFFIRMED.

KEITH, Justice (concurring and dissenting).

I concur in the affirmation of the judgment as to the contractor Bayshore, but I dissent from the affirmation as to the surety, Fidelity and Deposit Company of Maryland. As to the surety, I would reverse the judgment of the trial court and render judgment that District take nothing as to the surety.

The case, insofar as it relates to the surety, is controlled by the decision in *City of Midland v. Waller,* 430 S.W.2d 473, 475 (Tex.1968), and a reversal is required.

District's engineer, Hild, testified that Bayshore had completed the entire contract by December 1, 1971, and on that date he recommended that District accept it as complete and pay the final estimate. On De-

cember 20, 1971, the Board voted to accept the contract as complete and authorized the acceptance of Bayshore's final estimate of $20,400, and agreed to pay $13,400 then and the balance of $7,000 when certain federal funds were received. Although District did get the funds, it did not pay Bayshore.

On October 5, 1973, District sued contractor for breach of the contract and also named surety as a party defendant.

In *Midland*, supra, Justice Griffin quoted the one-year limitation period provided in Tex.Rev.Civ.Stat.Ann. art. 5160 (1971), and continued:

> "The present suit was filed more than one year after the City accepted the pool and paid the contractor. The limitation imposed by Art. 5160 applies, and the trial court correctly rendered a summary judgment that the City take nothing against the surety. The Court of Civil Appeals correctly affirmed that judgment. We affirm the judgment of both courts below in favor of the surety."

The contract in *City of Midland* also contained a one-year warranty, just as that in the case at bar. The only difference—which I do not consider to be material—in our case and *Midland* is that here the District only *promised* but did not actually pay the final amount due the contractor.

I would sever District's cause of action against the surety and enter a judgment reversing that of the trial court and rendering judgment in favor of surety; and, I would affirm the judgment against the contractor.