Opinion by Justice Moseley *701 When McKinney and McMillen, LLC (M&M), allegedly defaulted on its contract with the City of Wolfe City (the City) to provide it with a fully functioning, enhanced water distribution system with a fixed-base, automatic, meter-reading system, the City made demand on American Safety Casualty Insurance Company (American Safety), the issuer of M&M's performance bond, to complete the project. After American Safety refused to complete the project, the City filed suit against it, M&M, and others,[1] alleging breach of contract and promissory estoppel. After an adequate time for discovery, American Safety filed traditional and no-evidence motions for summary judgment on the City's contract and promissory estoppel claims, which were granted by the trial court. On appeal, the City complains that the trial court erred in granting both the traditional and no-evidence motions for summary judgment on its contract claims[2] and that it abused its discretion in denying the City's motion for reconsideration. We agree that the trial court erred in granting the motions for summary judgment.
I. Background
In December 2011, the City entered into a contract (the Contract) with M&M to enhance its water distribution and treatment system. After change orders, the total value of the Contract was $839,665.30. American Safety issued a performance bond in favor of the City guaranteeing M&M's performance under the Contract. As part of its work under the Contract, M&M was required to install 722 remote read water meters (meters) that would enable the City's employees to read the meters from their vehicles, rather than visually reading each individual meter. In May 2012, the first change order was entered into by the City and M&M that required M&M to change the automatic meter-reader (AMR) system from a drive-by system to a fixed-base system in which a meter interface unit (MIU) attached to the meters would electronically transmit information from the meters to the City's computer system. Under the Contract, any meter in this fixed-based AMR system was required to be compatible with the Datamatic Firefly MIU. M&M subcontracted with HD Supply Waterworks, Ltd., and/or HD Supply, Inc. (HD Supply), to supply the meters and the Datamatic MIUs. Apparently, HD Supply subcontracted with Datamatic, Ltd. (Datamatic), to supply and install the MIUs on the meters.
By March 27, 2013, most of the work under the Contract had been completed. On that date, Michael Tibbets, an engineer with Hayter Engineering (Hayter), the City's engineer on the project, signed a certificate of substantial completion affirming that the work under the Contract was substantially complete. Attached to the certificate of substantial completion was a pre-final inspection punch list of items that needed to be corrected or completed within thirty days, including a requirement to "[b]ring the Datamatic remote read water meter system up to full functional status." On that date, at least eighty-five MIUs had not been installed. Tibbets testified that although not all of the MIUs had been *702 installed, the part of the system that had been completely installed was functioning properly. Since the system was supposed to be expandable, and the City was not experiencing any problems, he believed he could say it was fully functional at that time. On April 17, 2013, Change Order No. 2 was executed by M&M, Hayter, and the City to add the installation of approximately eighty more meters and MIUs to the Contract and to extend the time for completing the project.
Shortly afterward, the City began experiencing significant problems with the system, including meters failing to correctly register the amount of water being used, meters running backwards, and meters randomly sending error messages. It is uncontested that a portion of the meter register heads and MIUs failed. The City worked with M&M and its subcontractors for several months in an attempt to resolve the ongoing problems, but the system was never fully functional. On November 4, 2013, the City made demand on American Safety under its performance bond. After M&M ceased working to resolve the problems with the AMR system, the City filed this suit on March 20, 2014.
After an adequate time for discovery, American Safety filed both traditional and no-evidence motions for summary judgment. In its no-evidence motion, American Safety asserted that there was no evidence that M&M breached the Contract and that there was no evidence that the problems experienced by the City were the result of a construction defect. In its traditional motion, American Safety argued that it was entitled to rely on Hayter's certificate of substantial completion such that American Safety owed no further obligation to the City under its performance bond. After the City filed its responses and the trial court heard the arguments of counsel, the trial court entered its order granting both of American Safety's motions.
II. Standard of Review
The grant of a trial court's summary judgment is subject to de novo review by appellate courts. Provident Life & Accident Ins. Co. v. Knott , 128 S.W.3d 211, 215 (Tex. 2003). In making the required review, we deem as true all evidence which is favorable to the nonmovant, we indulge every reasonable inference to be drawn from the evidence, and we resolve any doubts in the nonmovant's favor. Valence Operating Co. v. Dorsett , 164 S.W.3d 656, 661 (Tex. 2005). When the trial court does not specify the basis for its ruling, we must affirm a summary judgment if any of the grounds on which judgment was sought are meritorious. Merriman v. XTO Energy, Inc. , 407 S.W.3d 244, 248 (Tex. 2013).
"When a party moves for both traditional and no-evidence summary judgments, we first consider the no-evidence motion." First United Pentecostal Church of Beaumont, d/b/a the Anchor of Beaumont v. Parker , 514 S.W.3d 214, 219 (Tex. 2017) (citing Ford Motor Co. v. Ridgway , 135 S.W.3d 598, 600 (Tex. 2004) ). "If the non-movant fails to meet its burden under the no-evidence motion, there is no need to address the challenge to the traditional motion as it necessarily fails." Id. (citing Merriman , 407 S.W.3d at 248 ). "Thus, we first review each claim under the no-evidence standard." Id. A no-evidence summary judgment is essentially a pretrial directed verdict. Therefore, we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict. Wal-Mart Stores, Inc. v. Rodriguez , 92 S.W.3d 502, 506 (Tex. 2002). "We must determine whether the plaintiff produced any evidence of probative force to raise a fact issue on the material questions presented."
*703 Woodruff v. Wright , 51 S.W.3d 727, 734 (Tex. App.-Texarkana 2001, pet. denied). The plaintiff will defeat a defendant's no-evidence summary judgment motion if the plaintiff presented more than a scintilla of probative evidence on each element of its claim. King Ranch, Inc. v. Chapman , 118 S.W.3d 742, 751 (Tex. 2003) ; Rhine v. Priority One Ins. Co. , 411 S.W.3d 651, 657 (Tex. App.-Texarkana 2013, no pet.).
"Any claims that survive the no-evidence review will then be reviewed under the traditional standard." Parker , 514 S.W.3d at 219-20. To be entitled to traditional summary judgment, a movant must establish that there is no genuine issue of material fact so that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c) ; Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding , 289 S.W.3d 844, 848 (Tex. 2009). Once the movant produces evidence entitling it to summary judgment, the burden shifts to the nonmovant to present evidence raising a genuine issue of material fact. Walker v. Harris , 924 S.W.2d 375, 377 (Tex. 1996). A defendant who conclusively negates a single essential element of a cause of action or conclusively establishes an affirmative defense is entitled to summary judgment on that claim. Frost Nat'l Bank v. Fernandez , 315 S.W.3d 494, 508 (Tex. 2010).
III. Analysis
Under the terms of its bond, American Safety bound itself to perform M&M's contract with the City if M&M failed to do so. In addition, the bond specifically incorporated the terms of the Contract.[3] As American Safety correctly states, American Safety is only liable to the City under its bond if M&M has breached the Contract. See Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1 , 908 S.W.2d 415, 419 (Tex. 1995) ; Am. Empl'rs' Ins. Co. v. Huddleston , 123 Tex. 285, 70 S.W.2d 696, 697-98 (1934) ; Wright Way Constr. Co. v. Harlingen Mall Co. , 799 S.W.2d 415, 426 (Tex. App.-Corpus Christi 1990, writ denied) ; Bayshore Constructors, Inc. v. S. Montgomery Cty. Mun. Util. Dist. , 543 S.W.2d 898, 902 (Tex. Civ. App.-Beaumont 1976, writ ref'd n.r.e.). Therefore, in order to determine whether there is a scintilla of evidence showing that M&M failed to perform under the Contract and whether American Safety owed the City any obligation under its bond, we must examine the relevant terms of the Contract.
Paragraph 6.01(A) of the General Conditions provides that M&M, as the Contractor,
shall supervise, inspect, and direct the Work[4 ] competently and efficiently, devoting such attention thereto and applying such skills and expertise as may be necessary to perform the Work in accordance with the Contract Documents. CONTRACTOR shall be solely responsible for the means, methods, techniques, *704 sequences, and procedures of construction, but CONTRACTOR shall not be responsible for the negligence of OWNER or ENGINEER in the design or specification of a specific means, method, technique, sequence, or procedure of construction which is shown or indicated in and expressly required by the Contract Documents. CONTRACTOR shall be responsible to see that the completed Work complies accurately with the Contract Documents.
Paragraph 6.06(C) provides that
CONTRACTOR shall be fully responsible to OWNER and ENGINEER for all acts and omissions of the Subcontractors, Suppliers, and other individuals or entities performing or furnishing any of the Work just as CONTRACTOR is responsible for CONTRACTOR's own acts and omissions.
Paragraph 6.19(B), setting forth M&M's general warranty and guarantee, provides,
CONTRACTOR's obligation to perform and complete the Work in accordance with the Contract Documents shall be absolute. None of the following will constitute an acceptance of Work that is not in accordance with the Contract Document or a release of CONTRACTOR's obligation to perform the Work in accordance with the Contract Documents:
....
2. recommendation by ENGINEER or payment by OWNER of any progress or final payment;
3. the issuance of a certificate of Substantial Completion by ENGINEER or any payment related thereto by OWNER;
4. use or occupancy of the Work or any part thereof by OWNER;
5. any acceptance by OWNER or any failure to do so;
....
7. any inspection, test, or approval by others....
Further, Paragraph 13.07 of the General Conditions provides,
A. If within one year after the date of Substantial Completion or such longer period of time as may be prescribed by Laws or Regulations or by the terms of any applicable special guarantee required by the Contract Documents or by any specific provision of the Contract Documents, any Work is found to be defective, or if repair of any damages to the land or areas made available for CONTRACTOR's use by OWNER or permitted by Laws and Regulations as contemplated in paragraph 6.11.A is found to be defective, CONTRACTOR shall promptly, without cost to OWNER and in accordance with OWNER's written instructions: (i) repair such defective land or areas, or (ii) correct such defective Work or, if the defective Work has been rejected by OWNER, remove it from the Project and replace it with Work that is not defective, and (iii) satisfactorily correct or repair or remove and replace any damage to other Work, to the work of others or other land or areas resulting therefrom.
Under the Technical Specifications for the AMR system, M&M was required to provide and install, either itself or through its subcontractor or supplier, all necessary equipment, software, and training to furnish a complete and operational, fully automated meter-reading management system that met the requirements set forth in the technical specifications.
In addition, Paragraph 6 of the TWDB Construction Contract Supplemental Conditions requires that
[e]ach contractor awarded a construction contract furnish performance and payment bonds:
*705 (a) the performance bond shall include without limitation guarantees that work done under the contract will be completed and performed according to approved plans and specifications and in accordance with sound construction principles and practices; and
(b) the performance and payment bonds shall be in a penal sum of not less than 100 percent of the contract price and remain in effect for one year beyond the date of approval by the engineer of the political subdivision.
A. The Trial Court Erred in Granting the No-Evidence Motion for Summary Judgment
In its first issue, the City complains that the trial court erred in granting American Safety's no-evidence motion for summary judgment. Under a performance bond, a "surety is liable for a default in the performance by the principal of its contract obligations." Beard Family P'ship v. Commercial Indem. Ins. Co. , 116 S.W.3d 839, 845 (Tex. App.-Austin 2003, no pet.). The parties agree that to recover on American Safety's bond, the City must show that M&M breached its contract with the City. Therefore, our analysis will focus on whether the City produced any evidence that M&M breached the Contract.
In response to American Safety's no-evidence motion for summary judgment, the City produced, inter alia, the report of its expert, Marc Meadows, a copy of the relevant portions of the Contract, portions of the deposition testimony of George McKinney, a principal of M&M, and M&M's responses to requests for admissions. In addition, the City incorporated certain evidence attached to its response to American Safety's traditional motion for summary judgment, including, inter alia, a copy of the Certificate of Substantial Completion and attached punch list, excerpts from the deposition of Tibbets, and a copy of the TWDB Construction Contract Supplemental Conditions.
In its responses to the City's requests for admissions, M&M admitted that it used Datamatic as a supplier for the AMR system, that a portion of the register heads for the water meters and a portion of the MIUs for the water meters experienced failures, that the AMR system was not fully functional, and that it had ceased work on the project before the lawsuit was filed. In his deposition, McKinney testified regarding the AMR system that M&M installed the new water meters and that Datamatic installed the MIUs. He also testified that although all of the MIUs were required to be on the mesh-fixed network, he did not know if they were, and that he relied on Datamatic's representations that they were getting reports when they turned the system on. McKinney also agreed that the Contract calls for M&M to provide a fully functional system and for M&M to supervise and direct the work to ensure the work was done in accord with the Contract.
The certificate of substantial completion, dated March 27, 2013, contained a requirement for M&M to complete or correct the items on the attached punch list within thirty days, one of which was to "[b]ring the DataMatic remote read water meter system up to full functional status." In his deposition, Tibbets testified that for the AMR to be fully functional under the Contract, it would have to provide consistent and accurate data from each of the meters that migrates to the City's computers and populates the cells of the water billing software. He testified that he did not know that the system was ever fully functional. He also testified that as of June 19, 2013, the AMR system was not fully functional. Tibbets also discussed the problems that *706 arose in the AMR system after he had issued the certificate of substantial completion, as previously noted, and testified that he would not have issued the certificate of substantial completion had these problems been known at the time.
The expert report showed that as of November 2, 2015, of the 800 meters installed, 650 meters were active. Meadows opined that the installer of the MIUs likely installed faulty units and failed to test them before and after installation to ensure they were working properly.
Under the Contract, M&M was required to provide and install, either itself or through its subcontractor or supplier, all the necessary equipment, software, and training to furnish a complete and operational, fully functional AMR system that met the requirements set forth in the technical specifications. In addition, to the extent that its supplier, Datamatic, installed the MIUs, M&M had the duty under the Contract to supervise, direct, and inspect Datamatic's installation of the MIUs to ensure that Datamatic's installation, and the products it installed, were adequate to meet the requirements of the technical specifications. Further, under the Contract, M&M was obligated to repair or replace any defects in the work discovered within one year after substantial completion of the project. Viewed in the light most favorable to the City, as non-movant, the summary judgment evidence produced by the City is more than a scintilla of probative evidence that M&M breached the Contract by failing to properly supervise, direct, and inspect the installation of the MIUs, failing to provide and install a fully functioning AMR system, and by failing to repair or replace the defects discovered in its work.
Nevertheless, American Safety argues that in order to show that M&M breached the Contract, the City had to produce evidence that the problems with the AMR system were not caused by a design defect. American Safety relies on the italicized portion below of Paragraph 6.01(A) of the General Conditions:
CONTRACTOR shall supervise, inspect, and direct the Work competently and efficiently, devoting such attention thereto and applying such skills and expertise as may be necessary to perform the Work in accordance with the Contract Documents. CONTRACTOR shall be solely responsible for the means, methods, techniques, sequences, and procedures of construction, but CONTRACTOR shall not be responsible for the negligence of OWNER or ENGINEER in the design or specification of a specific means , method , technique , sequence , or procedure of construction which is shown or indicated in and expressly required by the Contract Documents. CONTRACTOR shall be responsible to see that the completed Work complies accurately with the Contract Documents.
(Emphasis added).
American Safety contends that Hayter's Technical Specifications required the use of Datamatic MIUs and thus specified the specific means of construction. Therefore, it reasons, the City had to produce evidence showing that the malfunctioning of the AMR system was not caused by the defective Datamatic MIUs. The City responds first that the assertion of a design defect under these circumstances would be an affirmative defense, which cannot be asserted in a no-evidence motion for summary judgment. Since this provision would not relieve M&M of liability under the Contract under the facts of this case, we need not decide whether this contract provision is in the nature of an affirmative defense.
*707 In a case involving similar provisions to the contract in this case, the Texas Supreme Court rejected the argument that the provision in 6.01(A)[5] relieved the general contractor of liability. Great Am. Ins. Co. , 908 S.W.2d at 424-25. In that case, the general contractor, Underground Utilities Company (Underground), removed a dry well and sent it to a subcontractor for refurbishment. The subcontractor submitted its plans for refurbishment to the utility district's engineer, who approved the plans. When the metal walls of the tank partially collapsed almost one year after installation, the utility district made demand on Underground, which refused to correct the problem, claiming that it had performed the work according to the plans and specifications approved by the utility district's engineer. Id. at 417. After a jury awarded damages against the general contractor and its surety, Great American Insurance Company, Great American appealed. Id. at 418.
On appeal, Great American argued that the collapse was caused by the defective design of its subcontractor, which was compounded by the approval of the subcontractor's plans by the utility district's engineer. It argued that the language in 6.01(A) contractually relieved it of responsibility for design defects. In rejecting this argument, the court noted that Great American's interpretation both broadened the scope of 6.01(A) and ignored the other contractual provisions subjecting Underground to liability for the work done by its subcontractors. Id. at 425.
First, the court held that the language in 6.01(A) did not relieve Underground from responsibility for all design defects. Rather, Underground remained liable for the work done by its subcontractor. In addition, other provisions of the contract provided that Underground was responsible to see that the finished work conformed to the contract documents and that Underground was fully responsible for the acts and omissions of its subcontractors and suppliers. Therefore, Underground was not contractually relieved of liability to the utility district. Id.
Similarly, paragraphs 6.01(A), 6.06(C), and 6.19(B) of the Contract required M&M to supervise, inspect, and direct all of the work under the Contract to ensure all work was performed according to the Contract documents, made M&M liable to the City for all of the acts and omissions of its subcontractors and suppliers, and obligated M&M to perform all the work in conformance to the Contract documents. The summary judgment evidence showed that Datamatic was M&M's supplier and that it installed all of the MIU's, approximately twenty percent of which were not functioning. Whether the twenty percent failure rate was caused by Datamatic's installation of faulty MIU's or by Datamatic's faulty installation, M&M remained liable under the Contract for Datamatic's acts or omissions.
For the reasons stated, we find that the trial court erred in granting American Safety's no-evidence motion for summary judgment, and we sustain the City's first issue.
B. The Trial Court Erred in Granting American Safety's Traditional Motion for Summary Judgment
In its second issue, the City challenges the trial court's grant of American Safety's traditional motion for summary judgment. In its motion, American Safety's sole ground for summary judgment was that *708 M&M had substantially completed the Contract. On appeal, American Safety argues, as it did at trial, that it was entitled to rely on the certificate of substantial completion issued by Hayter, who, it argues, was the sole and final judge of substantial completion under the Contract, and that the City admitted that M&M had substantially completed the project through its designated representative and through Change Order No. 2. Therefore, it argues, American Safety's performance bond was discharged. It also argues that the Contract did not extend its liability under the bond beyond the date of substantial completion. We disagree.
Texas courts have long held that a surety's liability under a performance bond issued to secure performance of a construction contract is determined by examining the underlying contract. See Huddleston , 70 S.W.2d at 696-98 ; Houston Fire & Cas. Ins. Co. v. Riesel Indep. Sch. Dist. , 375 S.W.2d 323, 325-27 (Tex. Civ. App.-Waco 1964, writ ref'd n.r.e.) ; Bayshore Constructors, Inc. , 543 S.W.2d 898, 902 (Tex. Civ. App.-Beaumont 1976, writ ref'd n.r.e.). In Huddleston , the contractor and the surety on his bond were sued for faulty workmanship and materials discovered after the architect had issued his final certificate and final payment had been made. Huddleston , 70 S.W.2d at 696. The underlying contract provided that neither the issuance of the architect's final certificate nor payment would relieve the contractor's responsibility for faulty materials or workmanship and obligated him to remedy any defects appearing within one year. Id. at 697. Since the bond secured the contractor's performance under the contract and the defects were unknown at the time of the issuance of the final certificate, the Commission of Appeals affirmed the judgment against the surety. Id. at 697-98.
In Houston Fire & Casualty Insurance Co. , Riesel Independent School District obtained a judgment against its contractor and the surety under the contractor's performance bond for faulty construction and failure to erect a school building in accord with the plans and specifications. Houston Fire & Cas. Ins. Co. , 375 S.W.2d at 324. On appeal, the surety argued that since the underlying contract required the architect to inspect the work and issue a final certificate upon final inspection, and the school board accepted the building, it was not obligated under the bond. Id. at 325. In rejecting this argument, the Court of Appeals noted that another provision of the contract provided that neither a final certificate nor payment "shall relieve the contractor of responsibility for faulty materials or workmanship and ... he shall remedy any defects due thereto ... which shall appear within a period of one year from the date of substantial completion." Id. Another provision stated that "[n]o certificate issued nor payment made to the contractor nor partial or entire use or occupancy of the work by the owner, shall be an acceptance of any work or materials not in accordance with this contract." Id. In construing the contract as a whole, the Court held that the contract obligated the contractor "to execute the work completely and satisfactorily in compliance with the specifications" and that the bond was conditioned upon the contractor performing the contract. Id. at 326-27. Therefore, the school district was entitled to recover under the bond. Id. at 327.
In this case, paragraph 6.19(B) of the General Conditions unambiguously provides that M&M has an absolute obligation to perform and complete the work under the Contract in accord with the Contract documents. It also provides that neither the issuance of a certificate of substantial completion by the engineer, nor any inspection, test, or approval by others, constitutes *709 an acceptance of work, or a release of M&M's obligation to perform the work in accord with the Contract documents. Paragraph 13.07 of the General Conditions provides that if within one year after the date of substantial completion any work is found to be defective, M&M shall promptly correct the defective work, or replace it with non-defective work. Also, paragraph 6 of the TWDB's Supplemental Conditions requires that the performance bond include, without limitation, guarantees that work will be completed and performed according to approved plans and specifications and to extend for one year after approval of the work by the engineer. American Safety's bond incorporates the Contract by reference and would include these provisions. See Bayshore Constructors, Inc. , 543 S.W.2d at 902 ; TransAmerica Ins. Co. v. Housing Auth. of City of Victoria , 669 S.W.2d 818, 822 (Tex. App.-Corpus Christi 1984, writ ref'd n.r.e.). Since the Contract provides that the issuance of a certificate of substantial completion does not release M&M of its obligation to perform the work in accord with the Contract documents, neither would it release American Safety from its obligations under its performance bond.
Nevertheless, American Safety contends that a surety may rely on a certificate of substantial completion as a final discharge of its liability on its performance bond, citing Hartford Fire Insurance Co. v. City of Mont Belvieu , 611 F.3d 289, 295 (5th Cir. 2010) ; Commercial Union Insurance Co. v. La Villa Independent School District , 779 S.W.2d 102, 105-06 (Tex. App.-Corpus Christi 1989, no writ) ; and TransAmerica Insurance Co. , 669 S.W.2d at 822. However, none of these cases held that the issuance of a certificate of substantial completion would absolutely discharge the surety of liability on its bond. Rather, each of these cases involved a determination of whether the actions were barred by the one-year statute of limitations to bring suits to enforce a performance bond for a public work contract required by Section 2253.021 of the Texas Government Code,[6] or its predecessor statute. City of Mont Belvieu , 611 F.3d at 294-95 ; La Villa Indep. Sch. Dist. , 779 S.W.2d at 105-06 ; TransAmerica Ins. Co. , 669 S.W.2d at 820-23.
Section 22.078(a) requires a suit on a performance bond required under Section 2253.021(a)(1) to be brought within one year "of the date of final completion, abandonment, or termination of the public work contract." TEX. GOV'T CODE ANN. § 2253.078(a) (West 2016). A preliminary issue in each of these cases was to determine when the contract was finally complete for statute of limitations purposes. For those purposes, each held that the date of the issuance of the certificate of substantial completion would establish the date that the construction project was finally complete. City of Mont Belvieu , 611 F.3d at 295 ; La Villa Indep. Sch. Dist. , 779 S.W.2d at 105-06 ; TransAmerica Ins. Co. , 669 S.W.2d at 823. Further, TransAmerica Insurance Co. recognized that the final completion date would be extended by the existence of a contractual provision requiring the contractor to remedy defects in workmanship arising after acceptance. TransAmerica Ins. Co. , 669 S.W.2d at 822-23. Therefore, these cases do not support American Safety's contention.
American Safety also argues that the City is bound by Hayter's certificate of substantial completion, the City's affirmation on Change Order No. 2 that the project was substantially complete, and the testimony of its designated representative that the project was substantially complete.
*710 It argues that since substantial performance is the legal equivalent of full performance, M&M fulfilled its obligation under the Contract and American Safety owed no further duty under its bond. We do not necessarily agree with American Safety's interpretation of this evidence or that the summary judgment evidence shows that M&M achieved substantial completion as it is defined in the Contract. However, even assuming that M&M achieved substantial completion of the Contract, this did not relieve M&M of its duties under the Contract to complete the work in accord with the Contract documents and to correct or replace any defective work.
As noted above, the Contract required M&M to provide and install a fully functioning AMR system, and a certificate of substantial completion did not release M&M from that duty. Further, the Contract obligated M&M to correct or replace any work found to be defective within one year after the date of substantial completion.[7] In addition, the Contract required that the performance bond guarantee, without limitation, that the work would be completed and performed according to approved plans and specifications and to extend for one year after approval of the work by the engineer. Construing the Contract as a whole, it is clear that M&M's obligations under the Contract extended beyond substantial completion and that American Safety would be liable under its performance bond, which incorporated all of these provisions, for M&M's default. See Bayshore Constructors, Inc. , 543 S.W.2d at 902 ; TransAmerica Ins. Co. , 669 S.W.2d at 822.
For these reasons, we find that the trial court erred in granting American Safety's traditional motion for summary judgment, and we sustain the City's second issue.[8]
We reverse the judgment of the trial court granting American Safety's traditional and no-evidence motions for summary judgment and remand this matter to the trial court for further proceedings.

The claims against M&M and the other defendants have been dismissed with prejudice.

The City does not appeal the summary judgments on its promissory estoppel claims.

The Contract entailed a number of documents, including, inter alia, the invitation to bid, M&M's bid, the signed agreement between M&M and the City, General Conditions, Supplemental General Conditions, Texas Water Development Board (TWDB) Supplemental Contract Conditions, the Technical Specification prepared by Hayter, and all written amendments, change orders, and other documents amending, modifying, or supplementing the Contract documents.

"Work" is defined as
The entire completed construction or the various separately identifiable parts thereof required to be provided under the Contract Documents. Work includes and is the result of performing or providing all labor, services, and documentation necessary to produce such construction, and furnishing, installing, and incorporating all materials and equipment into such construction, all as required by the Contract Documents.

Although the paragraph in Great American Insurance Co. was numbered differently, the wording is almost identical to that in paragraph 6.01(A) in this case. Great Am. Ins. Co. , 908 S.W.2d at 424-25. For clarity sake, we will refer to the paragraph as 6.01(A).

See Tex. Gov't Code Ann. § 2253.021(a)(1) (West 2016).

Tibbets testified that on March 27, 2013, when he issued the certificate of substantial completion, the meters and MIUs that had been installed were working properly and the City was not having any issues with the AMR system. He explained that since the system was supposed to be expandable to handle new construction, he certified the system as fully functional at that time. He also testified that the installation of the meters had not been completed by April 17, 2013, and that MIUs were still being installed as late as June 19, 2013. After he issued the certificate of substantial completion, the City began experiencing serious issues with the system, including meters registering significantly less water use than was actually used, meters running backward, and a significant number of the meters not working properly. He testified that these problems were major deficiencies. As discussed earlier, the summary judgment evidence showed that approximately twenty percent of the MIUs were not functioning properly and that M&M had abandoned the Contract before these problems were corrected. Viewed in the light most favorable to the City, this evidence raises a genuine issue of material fact as to whether M&M breached its obligation to correct or replace the defective Work discovered after substantial completion.

Since we have sustained the City's first two issues, we need not address its third issue.