**Mrs. Gussie GRIFFIN, Appellant,**

v.

**R. M. GRIFFIN et al., Appellees.**

No. 6730.

Court of Civil Appeals of Texas.

Texarkana.

Sept. 9, 1954.

Rehearing Denied Oct. 7, 1954.

See also, Tex.Civ.App., 233 S.W.2d 967.

Joseph C. Gladney, Henderson, R. C. Musslewhite, Lufkin, for appellant.

Wellborn & Wellborn, Henderson, Shead & Holt, Longview, for appellees.

FANNING, Justice.

This is a will contest, tried de novo in the District Court of Rusk County, Texas, before a jury, on a single special issue of whether the instrument purporting to be the last will and testament of W. T. Griffin, deceased, was procured through undue influence exerted on him by his surviving wife, Mrs. Gussie Griffin, the proponent of the will in question, and the appellant herein. R. M. Griffin, A. E. Griffin, Mrs. Tweedy Bryant and Mrs. Lovie Woods, the children of W. T. Griffin by a former marriage, are the contestants and the appellees herein. This will purported to be the joint will of the two, wherein the survivor received all the property of the other under such joint will, without naming an executor, and appellant sought administration with the will annexed.

Upon the jury's answering the special issue "Yes," that the will was procured by such undue influence, the court rendered judgment decreeing the same to be null and void, insofar as it purported to be the last will and testament of W. T. Griffin, deceased, and denying the probate thereof as such.

Appellant presents several points to the effect that there was no evidence of probative value that the will was the product of undue influence of Mrs. Gussie Griffin on her husband, W. T. Griffin, the testator, and that the trial court erred in not granting appellant's motion for instructed verdict, erred in submitting the issue of undue influence to the jury, and erred in not sustaining appellant's motion for judgment non obstante veredicto.

W. T. Griffin, a widower at the time, and appellant, Mrs. Gussie Griffin, married in 1924, in Polk County, Texas, and went to the home of W. T. Griffin in Rusk County, Texas, where they continued to live together as husband and wife until Mr. Griffin's death in 1947. At the time of his death he left surviving him Mrs. Gussie Griffin, his widow, and four children by a former marriage, named above. No children were born to the marriage of W. T. and Gussie Griffin. W. T. Griffin owned some real estate in Rusk County, Texas, as his separate property, having inherited same from his parents, which is the land that he and Mrs. Gussie Griffin made their home on during their marriage. At the time of said marriage Mrs. Gussie Griffin owned an interest in real estate in Polk County and later inherited other real estate from her sister. At various times after the execution of the will in question Mrs. Gussie Griffin sold her property in Polk County, W. T. Griffin having joined her in executing the deeds to such properties, she invested a part of the proceeds of such sales in improving the home on the real estate of her husband, W. T. Griffin, in Rusk County, where she and her husband lived, and also invested other portions of such proceeds in an automobile which she and Mr. Griffin used until the time of his death.

On June 16, 1944, W. T. Griffin and Gussie Griffin, as husband and wife, made and executed their joint and mutual will in the presence of Ernest Coker and Jack Tullos.

The said will was made by Mr. and Mrs. Griffin in Livingston, Texas, and was prepared by Hon. Ernest Coker, then a practicing attorney in Livingston and now District Judge, Special 9th Judicial District of Texas. Judge Coker, in relating the facts of and surrounding the execution of the will testified substantially as follows: That he had known Mr. W. T. Griffin about 10 or 11 years prior to the execution of the

will, that he had seen Mr. Griffin often during that period of time, that he knew Mrs. Gussie Griffin, who was a distant relative "about a fourth cousin to his mother," that Mrs. Griffin had formerly lived in Polk County and that she had relatives in Polk County and that she and Mr. Griffin frequently came to Polk County, that Mr. Griffin was active and alert on the occasions he saw him in Polk County, that the first time Mr. Griffin talked to him about preparing his will was while Judge Coker was in the trial of a lawsuit in the courthouse at Livingston, when Mr. Griffin was alone. And that Mr. Griffin requested him to draw a joint will for himself and his wife to the effect that the survivor would receive the property of the other spouse, that Judge Coker did not have time to draw the will at the time of that first conversation, that about a month or so later Mr. Griffin came back to Polk County and while alone asked Judge Coker if he had had a chance to draw the will, which Judge Coker answered that he had not drawn same at that time. On another occasion some weeks later Mr. Griffin came to Judge Coker's office in Livingston alone and on that occasion Judge Coker dictated the will to his secretary in the presence of Mr. Griffin, and Mr. Griffin said it was what he wanted, Mr. Griffin then told Judge Coker that he would go get his wife, who was visiting relatives in Livingston. This occurred prior to noon and shortly after one p.m. Mr. and Mrs. Griffin came to the office, that Mr. and Mrs. Griffin read the will and that after they finished reading the will, and Judge Coker had read the will over to them, that Mr. Jack Tullos was called as a witness to the will, and that the will was executed by Mr. and Mrs. Griffin with the usual and proper formalities with Judge Coker and Jack Tullos as the attesting witnesses. Mr. Tullos also testified substantially to the same effect with respect to the execution of the will in accordance with the legal formalities. Judge Coker also testified that he had never talked to Mrs. Griffin about a will until she came in with her husband to execute the will in question. Judge Coker also testified that in his opinion the testator was of sound mind at the time of the execution of the will and that as far as he knew the will had never been revoked. On cross-examination by appellee's counsel, Judge Coker in answer to the question as to whether "he had any suspicion he (Mr. Griffin) was under the influence of this woman all the time" stated "apparently not. I would not say he was under the influence of anyone." This statement of Judge Coker was the only direct evidence in the record on the issue of alleged undue influence. Judge Coker further testified that he saw Mr. Griffin in Polk County several times after he made the will in 1944 and that Mr. Griffin thereafter at no time ever expressed any dissatisfaction to him with respect to the will. Mrs. Griffin's testimony with respect to the execution of the will is also in substantial accord in all material respects with the testimony of Judge Coker and Mr. Tullos. We think that the record in this case and all the direct evidence in the record clearly show that the execution of the will was shown to have been accomplished under all the requirements and solemnities prescribed by law.

Appellees did not produce any direct evidence that Mrs. Gussie Griffin did any specific act or acts that induced W. T. Griffin to execute the will in question, nor did they produce any character of direct evidence that Mrs. Gussie Griffin exercised any undue influence with respect to the testamentary act of her husband *at the time of the execution of the will.* Appellees apparently rely upon a chain of circumstances and on circumstantial evidence to attempt to raise the issue of undue influence. Appellees in their brief state "it is settled that the exercise of undue influence may, and most times must, be proved by circumstantial evidence" and cite the following quotation from Long v. Long, 133 Tex. 96, 125 S.W.2d 1034, 1036, as follows: "It is rarely possible to prove undue influence by what is generally known as direct testimony. Undue influence is usually a subtle thing, and by its very nature it usually involves an extended course of dealings and circumstances. Usually a person charging undue influence must substantiate such charges by circumstances extending over

a considerable length of time. It is therefore the settled rule that undue influence can be established by what is known as circumstantial, as well as direct, evidence." We think that the record in this case shows that appellees rely upon circumstantial evidence alone to support their claim of undue influence.

Appellees in support of their position point to circumstances and testimony, a portion of which may be briefly stated as follows: At the time of the execution of the will in question W. T. Griffin was 76 years old; that he executed the will in Livingston, Texas, about 100 miles from his home, although he was friendly with Judge Brachfield, an eminent attorney then living in Henderson, Texas, and that he could have had it written by lawyers in Rusk County, near his home, that the will was written by an attorney who was a distant relative of his wife. Mrs. R. M. Griffin, wife of one of the appellees, testified as follows:

"A. He said he (W. T. Griffin) got sick, he told me, he said, 'Alice, I thought I was going to die, I was never as sick in my life.' I said, 'Paw, what was wrong?' He said, 'I don't know, But I thought I was going to die.' I said, 'Well, did you have a doctor with you?' He said, 'No, I asked Gussie to send for you all and she said if I wasn't better she would send tomorrow but maybe you will be better.' But she didn't send, and he said he didn't see a doctor until he came back to Mount Enterprise and saw Dr. Ross."

There was also testimony to the effect that appellant during her marriage attended to all the business and on one occasion bought a car and put it in her name, that appellant was an extremely "bossy" woman and "bossed" W. T. Griffin. Mrs. R. M. Griffin testified as follows:

"Q. Didn't they handle that just like the ordinary husband and wife handle their affairs? A. No, sir.

"Q. How did they handle it different? A. Well, for the simple reason she always bossed him.

"Q. Mom? A. She was always boss.

"Q. She bossed him and everybody else down there? A. That is right."

Appellees also point out the following testimony of Will Bailey:

"A. She was the boss about that, Mr. Griffin would tell me what to do all right, but it was what she would say * * * A. He was a man that done just what his wife said.

"Q. What? A. He was a man that done just what his wife said."

Appellees in their brief also point out the following testimony of Albert Harrington:

"Q. Would you say she was bossing things and running things? A. Yes, sir.

"Q. Did she ever let up bossing after she came there? A. Not that I knew about.

"Q. From the time she came there until he died she was bossing? A. Yes, the way I would conclude it.

"Q. You told Mr. Musslewhite they didn't appear to you like a husband and wife would act and you held up two fingers but in this case there was one, who was the one in this case? A. Mrs. Griffin.

"Q. She ran the whole show and controlled Mr. Griffin? A. Yes, sir.

"Q. Was she doing that in June, 1944? A. She did from the time I knew them on out.

"Q. Did she ever quit bossing and controlling that you know of? A. No."

Appellees in their brief also point out the following testimony of John Thompson:

"Q. I will ask you if you ever knew of any show of dislike by Mr. Will Griffin against his children? A. I did not.

"Q. Did he love them? A. He loved his children as much as any father would."

In their brief appellees also point out the following testimony of Mrs. Arthur Griffin, wife of one of the appellees:

"A. Well, I was there that morning, I left in the afternoon, but mostly he was sitting there talking about his health, you know, like that, and talking about his children and he said he didn't have very much but whenever he passed away he wanted them to have it every bit.

"Q. He wanted his children to have it? A. Yes, sir, he wanted his children to have it and she told him he didn't have anything only that poor old land and he said, 'Well, I know it, but I want them to have it.'

"Q. What was Mr. Griffin doing there, if anything? A. He was sitting there crying.

"Q. Do you know why he was crying? A. Well, his sickness and then he said he just didn't have much to give them. He said they had been so kind and helpful and all like that and helping him so much until he did want to leave something for them, but he didn't have as much to leave for them as he wanted to * * * A. Well, just about four weeks before he died, me and my husband went over there and she was at the cow pen, and we asked him (W. T. Griffin) how he felt and he said he didn't feel good and he didn't think that he was going to be here with us much longer. My husband asked him, said, 'Paw, if that is the way you feel about it, I have one question I want to ask you, she made the remark to some people sitting up here when you were dead all she had to do was to bring the will out and read it to the children and it was all hers, if that is so I want to know it and if it is not so I want to know it.' He raised up on his elbow and said, 'Ruben, she hasn't got any will.' He said, 'Well, I wanted to know it if she did have or if she didn't have.' He said, 'She hasn't got any will.' "

There was also testimony to the effect that Mrs. Gussie Griffin carried the money for both herself and her husband, that he had to ask her for money when he needed any, that when Mr. Griffin wanted a bottle of snuff "he had to ask her for the money to pay for the snuff" and "she fussed at him for snuff-dipping," and that Mrs. Griffin collected the "rent money." A number of the witnesses testified to various conclusions to the effect that Mrs. Griffin was "boss" and "was running the whole show" and conclusions and statements of similar import, to which no objections were made. There were some instances related where Mrs. Griffin would "boss" her husband, such as jerking a hammer out of his hand, and other things. The statement of facts is long and contains 358 pages; we have carefully examined it and we think the boiled-down effect of appellees' testimony is largely to the effect that there was a general "bossing," "dominating of," and "domineering-over" Mr. Griffin by Mrs. Gussie Griffin.

Appellees also contend that the will was an unnatural one and that their father was not overly fond of his wife, Mrs. Gussie Griffin. We cannot agree that the will was an unnatural one under the facts in this case. Mrs. Griffin lived with her husband 23 years and under this record looked after him during his illness, was a competent housekeeper, cook and an attentive and kind wife, used her property to improve the home, and we do not believe that the will was unnatural under the record in this case.

The rules of law governing the issues here presented are well established and well recognized. However, no two cases are alike and it is impossible to lay down any hard and fast rules which will accurately govern the question as to whether a given record contains affirmative probative evidence of undue influence. Each case must stand on its own bottom as the legal sufficiency of the facts proven. Long v. Long, 133 Tex. 96, 125 S.W.2d 1034.

Undue influence is defined as that which compels the testator to do that which is against his will, from fear, the desire of peace, or some feeling which he is unable to resist. It cannot be presumed or inferred from opportunity or interest, but must be proved to have been exercised in relation to the revocation or will itself and not merely in other transactions. Mere persuasions, entreaties, or mere suspicion of undue influence will not invalidate a revocation or a will on such grounds. Evidence that a former will, differing from one sought to be annulled on the grounds of undue influence, had been destroyed or revoked would not establish undue influence. The fact that a testator was under the general and even controlling influence of other persons in the conduct of his affairs will not suffice to invalidate the will unless that influence was specially exerted upon the testamentary act. To set aside a judgment admitting the will to probate on grounds of undue influence, the burden is on the contestant to show that testator was induced to act contrary to his own wishes and make a different will from one he would have made if left entirely free to act according to his own judgment and discretion. Stolle v. Kanetzky, Tex.Civ.App., 259 S.W. 657, writ refused. Black v. Black, Tex.Civ.App., 240 S.W.2d 458, writ ref., n.r.e.

In Pierson v. Pierson, Tex.Civ.App., 57 S.W.2d 633, 636, it is stated: " 'Undue influence cannot be presumed or inferred from opportunity or interest, but must be proved to have been exercised, and exercised in relation to the will itself, and not merely to other transactions.' "

In Burgess v. Sylvester, Tex.Civ.App., 177 S.W.2d 271, affirmed by the Supreme Court, 143 Tex. 25, 182 S.W.2d 358, it was held that in order to invalidate a will on the grounds of undue influence, such must have been exercised at the time of the execution of the will and that such must have resulted therefrom and that a will could not be set aside on proof of facts showing no more than an opportunity to exercise such influence may have existed or on proof of facts raising a bare suspicion that such undue influence may have been exercised.

In Black v. Black, Tex.Civ.App., 240 S.W.2d 458, 466, writ refused, n.r.e., the court stated: "Contestant contends that undue influence may be established by circumstantial evidence. Such may be done provided the circumstances are strong and convincing enough and of such probative force to lead a well guarded mind to a reasonable conclusion that such influence was exercised by the alleged party and that it controlled the will power of the testator at the very time the will was executed. Taylor v. Small, Tex.Civ.App., 71 S.W.2d 895. Under such circumstances, before the evidence is sufficient to submit an issue on undue influence to a jury, it must be more than purely speculative and when its probative force is so weak that it only raises a mere suspicion or surmise, the evidence is insufficient to support such an issue. * * * The rule has been well established that the issue of undue influence is not raised unless the record contains some evidence of probative force that such influence was exercised, and that it subverted and overpowered the will of testator and caused the execution by him of a will which he would not have executed but for such influences. Olds v. Traylor, Tex.Civ.App., 180 S.W.2d 511, writ refused, and other authorities there cited."

In Lynn v. Jackson, Tex.Civ.App., 216 S.W.2d 649, 654, writ ref., n.r.e., in reversing and rendering judgment, the court stated: "No matter how liberal the rule in the admission of claimed-evidence of undue influence should be, the proffered testimony of it must have a bearing somewhere, and in this instance, as indicated, there was not only nothing tangible with reference to the execution of this will about the 'domination' 'domineering' relied-upon as its sole manifestation, but there was the affirmative ousting of its possible application by the undisputed and positive testimony the other way of the only persons having any knowledge of this transaction at the time it occurred. In other words, granting that such domination throughout the

married-life of Mr. and Mrs. Lynn was such a brooding-presence, the indisputable evidence in the record here shows that it was not applied to at least this one joint-transaction of their lives."

We have carefully considered the case of Long v. Long, supra; Barksdale v. Dobbins, Tex.Civ.App., 141 S.W.2d 1035, error refused, and other cases cited by appellees and are of the opinion that the fact situations in those cases are different from the facts involved here and are clearly distinguishable.

We have carefully reviewed all the evidence and circumstances which appellees contend sustain the finding of the jury and have also searched and carefully reviewed the entire record to find all testimony or circumstances which might tend to support the verdict of the jury and have reviewed all of same in the light of the rule of law stated in Barksdale v. Dobbins, supra, that the evidence will be considered most favorable to the verdict, disregarding conflicts, contradictions and adverse evidence and that all evidence tending to support the jury finding must be accepted as true and interpreted most favorably to the verdict. After so viewing the entire record we conclude that there is no evidence of probative value to support the finding of the jury that the will in question was procured by undue influence on the part of Mrs. Gussie Griffin, and that the trial court erred in not sustaining appellant's motion for instructed verdict, erred in not granting appellant's motion for judgment non obstante veredicto, and that the will of W. T. Griffin should be admitted to probate as prayed for by appellant and that appellant is entitled to letters of administration with the will annexed as prayed for.

We deem it unnecessary to pass on appellant's other points since these conclusions determine the merits of the appeal; they require that the judgment of the trial court be reversed, and the cause here rendered in appellant's favor as prayed for. It will be so ordered.

Reversed and rendered.