

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-19-00039-CV

_____

ESTATE OF HENRY EZEKIEL "ZEKE" GROGAN, DECEASED

On Appeal from the County Court at Law
Harrison County, Texas
Trial Court No. 2018-17,778-CCL

Before Morriss, C.J., Burgess and Carter,* JJ.
Opinion by Chief Justice Morriss

_____

*Jack Carter, Justice, Retired, Sitting by Assignment

O P I N I O N

Although—when eighty-three-year-old Henry Ezekiel "Zeke" Grogan lost his battle with cancer and died in 2018—Zeke was single and had no lineal descendants, he was "lifetime companion" to Linda Carpenter, with whom he had lived for decades after the two had formed a long-time, close working relationship in his dental practice. Probated was Zeke's 2010 lawyer-drawn will that left essentially all of Zeke's assets to Linda, and none to Zeke's siblings, George and William, or to their descendants. Zeke's surviving brothers separately contested the 2010 will. This appeal involves William's contest[1] and comes from a summary judgment upholding the probate in Linda's favor.[2]

In granting Linda's motion for summary judgment, the trial court found that there was no evidence that the 2010 will was the result of undue influence exerted by Linda on Zeke, that there was no evidence of a will or testamentary instrument executed by Zeke after the 2010 will, and that the 2010 will was executed without undue influence and was not subsequently revoked.

William argues on appeal that Linda's summary judgment was improper because he had raised fact issues regarding whether Linda had unduly influenced Zeke to execute the 2010 will and whether it had been later revoked and because his request for a continuance to conduct further discovery was improperly denied. We affirm the trial court's judgment, because (1) the summary-judgment evidence raised no fact issue regarding undue influence, (2) the summary-judgment

---

[1]William's contest was initiated by and through his daughter and agent, Stephanie Grogan Payne. George's separate contest is not part of this appeal.

[2]In response to William's contest, Linda filed a traditional and no-evidence motion for summary judgment asserting that there was no evidence either that the 2010 will was executed as a result of undue influence or that there was any subsequent revocation. The trial court agreed, granted Linda's motion for summary judgment, admitted the 2010 will to probate, and issued letters testamentary to Linda.

evidence raised no fact issue regarding revocation, and (3) denying William's requested continuance to conduct further discovery was within the trial court's discretion.

*(1)      The Summary-Judgment Evidence Raised No Fact Issue Regarding Undue Influence*

A summary judgment in a will contest is reviewed as in any other case, using a de novo standard of review. *In re Estate of Fisher*, No. 06-14-00029-CV, 2014 WL 5465869, at *1 (Tex. App.—Texarkana Oct. 29, 2014, no pet.) (mem. op.) (citing *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003)). In such a review, all evidence favorable to the nonmovant is assumed true, along with every reasonable inference to be drawn from the evidence, with any doubts resolved against the summary judgment. *City of Wolfe City v. Am. Safety Cas. Ins. Co.*, 557 S.W.3d 699, 702 (Tex. App.—Texarkana 2018, pet. denied) (citing *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005)). When both traditional and no-evidence summary judgments are reviewed, we look first at the no-evidence motion. *Id.* (quoting *First United Pentecostal Church of Beaumont*, *d/b/a The Anchor of Beaumont v. Parker*, 514 S.W.3d 214, 219 (Tex. 2017) (citing *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004))).

If a motion for summary judgment claims that there is no evidence supporting any element of a claim or defense on which the nonmovant bears the burden of proof at trial, we look to see if the nonmoving party has presented evidence raising a genuine issue of material fact on the element or elements in question. TEX. R. CIV. P. 166a(i); *Fisher*, 2014 WL 5465869, at *1 (citing *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006); *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). If our review of the no-evidence motion demonstrates the lack of necessary evidence

3

supporting the claim, we need not address the traditional motion for summary judgment. *City of Wolfe City*, 557 S.W.3d at 702 (quoting *Parker*, 514 S.W.3d at 219).

Since a no-evidence summary judgment is effectively a pretrial directed verdict, we use the directed-verdict standard of review in reviewing such a summary judgment. *Id.* at 702–03 (citing *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002)). Our task boils down to determining whether the claimant "produced any evidence of probative force to raise a fact issue on the material questions presented." *Id.* (quoting *Woodruff v. Wright*, 51 S.W.3d 727, 734 (Tex. App.—Texarkana 2001, pet. denied)).

A no-evidence summary judgment motion fails if there is "more than a scintilla of probative evidence on each element" of the claim. *Id.* at 703 (citing *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003); *Rhine v. Priority One Ins. Co.*, 411 S.W.3d 651, 657 (Tex. App.—Texarkana 2013, no pet.)). "More than a scintilla of evidence exists when the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Fisher*, 2014 WL 5465869, at *1 (quoting *King Ranch*, 118 S.W.3d at 751). The evidence, however, fails to reach that threshold if "it is 'so weak as to do no more than create a mere surmise or suspicion' of fact." *Id.* (quoting *King Ranch*, 118 S.W.3d at 751).

We first address William's argument that a fact issue on his claim of undue influence made a summary judgment unavailable. To show undue influence, a will "contestant must prove '(1) the existence and exertion of an influence (2) that subverted or overpowered the mind of the testator at the time of execution of the instrument (3) so that the testator executed an instrument he or she would not otherwise have executed but for such influence.'" *Id.* at *2 (quoting *In re Estate of*

4

*Steed*, 152 S.W.3d 797, 807 (Tex. App.—Texarkana 2004, pet. denied)). Here, William bore the burden of proving undue influence at trial and was "required to 'introduce some tangible and satisfactory proof of the existence of each of the above[-]stated elements of undue influence' to survive [the] no-evidence challenge." *Id.* (citing *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963)).

The summary judgment evidence showed that Zeke's relationship with his brothers was strained. George testified that they practiced dentistry together until a fight in the office caused a breakup in the brothers' professional and personal relationships in 1979. George admitted that he strangled William in the office and would have killed him had Zeke not intervened. George testified that he never spoke to William again after the fight and had no connection with Zeke for a long time. George never spoke to Zeke's ex-wife and was not invited to their wedding. William testified that he did not have close contact with either brother and that both George and Zeke had told him to stay out of their business. William did not even know where Zeke lived.

In contrast, the evidence showed that Zeke and Linda had a close relationship for thirty years. Zeke and Linda met while attending church in 1987, formally began dating in February 1998, and lived together as "lifetime companions." Linda testified that she and Zeke loved each other and that Zeke loved her children from a prior marriage, including her son, Ryan Carpenter. In 1995, without Linda's knowledge, Zeke executed a holographic will leaving William and George $1.00 each and everything else to Linda. The 1995 will provided that Ryan would be the sole contingent beneficiary in the event Linda predeceased Zeke. Linda testified that she did not

5

read the 1995 will, but that Zeke handed it to her for safekeeping and informed her that she was the beneficiary and her children were contingent beneficiaries.

In 2010, Zeke told Linda that he was going to obtain a "lawyer-drawn-up" will. Before the appointment with his lawyer, James Powers Branch, Zeke asked Linda to copy notes he had written for the attorney, word for word, so it would be in better handwriting. Linda testified that she copied Zeke's notes as asked. The notes, produced by Branch from his files, stated, among other things, that Linda should be the "Sole Beneficiary," that Ryan would be the contingent beneficiary, and that Zeke "want[ed] to disinherit [his] brothers, George Gram & William W. Grogan; [his] niece Stephanie Grogan Payne & her daughters Phoebe & Oliva Payne as well as any cousins or other relatives."

Branch's affidavit explained the circumstances surrounding the drafting and execution of the 2010 will. Branch swore that he met alone with Zeke on December 8, 2010. According to Branch, Zeke brought a copy of the 1995 will and said he wanted to leave everything to Linda, to make Ryan the contingent beneficiary, and to disinherit his brothers. Branch's December 8, 2010, "MEMO TO FILE" on Zeke said, "He wants to leave everything to Linda L. Carpenter if she survives him. If she does not survive him, it goes to Ryan P. Carpenter." Zeke also requested that Branch prepare documents giving Linda statutory power of attorney in the event of disability or incapacity and medical power of attorney. Branch stated, "I found Zeke to be decisive and strong-willed. He knew exactly what he wanted." As a result, Branch prepared the documents in accordance with Zeke's instructions.

6

Branch said that Zeke returned to the office alone to execute the documents on December 16, 2010. During the signing, Branch stated that the only people in the room were Branch; his employee, Valerie Wilds; and Margaret H. Harbstreit, "a bookkeeper for Ron Dunbar." Branch stated that the 2010 will was executed with the formalities of Texas law and that Zeke was of sound mind, had testamentary capacity, and "understood who his heirs at law were and who he wanted to be his beneficiaries."[3] In accordance with Zeke's wishes, the 2010 will named Linda independent executrix, left Zeke's estate to Linda, made Ryan contingent beneficiary, and stated, "I have intentionally omitted to provide for all of my heirs at law or other relatives who are not specifically mentioned in this will." The 2010 will was signed by Zeke and two witnesses and was self-proving. Linda testified that the 2010 will was placed along with the 1995 will in a chest of drawers in the master bedroom and that Zeke understood the 2010 will.

Linda testified that Zeke was in good health in 2010. However, after Zeke's death in 2018, William and George raised the issue of undue influence. In addition to her personal relationship with Zeke, Linda had been employed by Zeke's dental practice and helped him with his cattle business. Even after Zeke's dental practice closed in 2009, Linda sent bills for accounts receivable, paid bills, wrote checks for Zeke to sign, ordered supplies, and delivered monthly statements for Zeke's business endeavors to his accountant. At home, Linda paid for the landline telephone, answered Zeke's phone calls since he did not have a phone of his own, delivered his messages, and assisted Zeke with other matters. According to Linda, Zeke employed someone to write his personal checks, but she assumed that responsibility when that person quit her employment.

---

[3]It is undisputed that Zeke had testamentary capacity.

7

William questioned Linda's influence over Zeke as a result of her relationship and because Zeke either loaned or gave approximately $300,000.00 to Ryan during his lifetime. Linda explained that she and Ryan never asked Zeke to loan or give Ryan money, but that Zeke had offered to save Ryan from bankruptcy after Linda apprised him of Ryan's financial situation. Linda was aware of the money Zeke loaned Ryan because she handled the check registers on Zeke's personal bank account. According to Linda, Zeke had loaned money to Ryan even when he was borrowing money from George to cover his losses from the cattle business. Linda testified that she told Zeke he could stop loaning money to Ryan, but Zeke said, "No, absolutely not. This is what we're going to do, we're going to stay the course . . . . If I have to sell the Jefferson place, I will."[4]

During his deposition, William testified that he did not know of Zeke's medical condition before his death, that he met Linda only once, and that he did not know anything about Zeke and Linda's relationship. William testified that he later found out that Zeke and Linda had lived together for a long time. William did not remember if he knew about any will before Zeke's death and admitted that he knew nothing of the circumstances of the 2010 will's execution. When asked if anyone unduly influenced Zeke, William answered, "Could be . . . . [b]ecause . . . we weren't that close except in rare instances." When asked what he meant by "[c]ould be," William answered, "[Zeke] was around a lot of people."

Stephanie also testified that she knew nothing of the circumstances of the 2010 will and was unaware that Zeke had a will until after his death. Stephanie did not know about Zeke's

---

[4]Zeke owned several properties.

8

private life or whether he had children, but testified that he was mentally competent until the time of his death. Stephanie could not answer whether Zeke and Linda loved each other, did not know of their living conditions, and testified, "[A]s far as I know, they were roommates . . . . I didn't know anything about their relationship other than the fact that she worked at the dental office as an assistant."

George also testified that he did not know if Zeke loved Linda and that he was not aware of Zeke's execution of the 2010 will until after its execution. The evidence established that Zeke and George did not communicate often until after George's wife passed away. George testified that he asked Zeke "if he had a lawyer prepare a will . . . when [George] was trying to get [his will] together," and Zeke said that "it was . . . just a quicky thing that was [of] no value [and] wouldn't help [George] at all." George testified that Zeke, who "was mentally competent every time [he] saw him," "volunteered that Linda was supposed to get . . . five acres and the Curtis Black house, and that was her reward for 25 years of service as an employee."

When asked if he believed anyone had unduly influenced Zeke in executing the 2010 will, George testified, "The only thing he told me was that he was in a lot of pain, and Linda was pushing him and pushing him, and pushing him to feed the cows. He was dedicated to those cows, and she was pushing him, pushing him because he might come out dead." George did not remember what year Zeke made that statement, did not know what kind of pressure Linda was putting on Zeke to have a will "so she could feed the cows if [Zeke] came out dead," but later claimed that Zeke said at an unidentified time that Linda was trying to poison him and that their situation was unhappy. George also said that he had to call Linda's landline to contact Zeke and that Zeke had told a

9

neighbor, Tommy Perry, that Linda would get five acres and a house after his death and that he had designated other plots of land to Perry.

Perry testified that he was not involved in Zeke's life in 2010, that he started working for Zeke in 2013, and that he stopped working for him in September 2017 after Zeke accused him of stealing his air compressor. Perry, who was arrested twice before for theft, testified that, because of Linda, he was never invited to Zeke's home. According to Perry, Zeke said he made a will in 2010 when he had no one in his life except for Linda and Ryan. When asked if he had personal knowledge of any undue influence, Perry said, "I do know that [Zeke] told me that [Linda] was pressuring him to make the will" because he had a few surgeries before 2010 and he wanted to make sure his cattle were fed. Perry claimed Zeke called Linda a "witch" and said, "That lady will get her talons in you, boy, and won't let up."

According to Perry, Zeke "did rewrite a new will" in 2016, but Perry never saw it. Yet, Perry claimed he was supposed to receive several plots of land under the new will. When asked if he was interested in Zeke's estate, Perry said, "I'm saying that the man told me that he was leaving Linda the house and five acres . . . . And he told me the rest of the property would be mine." Although he never saw a new will, Perry said, "[Zeke] told me he made a will . . . and that . . . Linda knew about the new will."

According to Perry, Zeke said Linda "had found some paperwork regarding . . . the will and that it had been changed" in June or November 2016. Perry claimed that the new will was in the trailer house office Linda cleaned on the day after Zeke's death. Linda swore that she had never heard of any will executed after the 2010 will. She testified that she enlisted help from two

of Zeke's friends to move a filing cabinet on the day after Zeke's death based on his instructions to take the deeds to the property.

Perry was not the only person to claim an interest in Zeke's estate after his death. After her deposition, Stephanie filed an unsworn declaration stating, "Uncle Zeke pointed to the ground and said that when he closed his eyes for the last time this property would be mine." Cruz Perez, who worked for Zeke fixing ranch equipment, testified that, in 2015, Zeke told him he "wanted to give [him] 5 acres so [he] could build a home for [his] family." Perez also said Zeke told him he would get his dental office building one day. According to Perez, "Weeks before he died[, Zeke] brought up the 5 acres again. Zeke told me that I would get the land after he passed away. I assume he did this by a will because he told me he had a will."

In response to those claims, Harold Cox, Zeke's accountant who had a business relationship with Zeke for forty years, filed an affidavit stating,

> I would describe Zeke as headstrong; Zeke pretty much ran his own show . . . . I talked with Zeke in March 2018. Zeke told me that he was dying. I asked whether he had his affairs in order. He told me that he had a will and that he was leaving everything to Linda Carpenter.

Cox updated that statement to say, "He told me that he had a will and that he guessed he was leaving everything to Linda." Zeke's neighbor, Stan Hollie Jones, filed an unsworn declaration stating that "a month before Zeke died he told [Stan] that he planned on leaving Linda the house on Curtis Black Road and three to five acres. Zeke told [Stan] that he felt like he owed Linda that."

11

Although William, in his deposition, claimed no knowledge of Zeke's relationship with Linda, he asserted that the 2010 will was the result of Linda's undue influence. His interrogatory responses alleged,

> Zeke was increasingly dependent on Linda Carpenter, including but not limited to in the management of his financial estate. Further, as his dependency on Linda Carpenter increased, he became more isolated from his family and other friends. Ms. Carpenter took advantage of that dependency to influence Zeke to make decisions he otherwise would not have made.

William listed Zeke's ongoing knee pain, mobility issues, "weak physical state, as well as his isolation from individuals other than Linda Carpenter and her son," as conditions that made Zeke susceptible to undue influence. George's interrogatory responses said, "[I]t was my understanding that Zeke wished for the family land to stay in the family," claimed the 2010 will reflected Linda's intent, claimed Zeke did not like Ryan, and stated, "Zeke was unduly pressured by Linda Carpenter into lending and/or giving Ryan Carpenter large sums of money that he did not want to lend/give . . . Zeke would not have wanted to make Ryan Carpenter the alternative beneficiary of his entire estate."

William argues that Linda unduly influenced Zeke, because she was in a confidential or fiduciary relationship with him. "If a will opponent's challenges to a will are based on a confidential relationship between the testator and the will proponent, the opponent has the burden of establishing a confidential relationship." *In re Estate of Coleman*, 360 S.W.3d 606, 611 (Tex. App.—El Paso 2011, no pet.).

Fiduciary relationships take two forms: "(1) a formal fiduciary relationship arising as a matter of law, such as between partners or an attorney and a client, and (2) an informal or

confidential fiduciary relationship arising from a moral, social, domestic, or merely personal relationship where one person trusts in and relies on another." *Gray*, 428 S.W.3d at 316 (citing *Crim Truck & Tractor v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992), *superseded by* TEX. REV. CIV. STAT. art. 4413(36), repealed by Act of May 22, 2001, 77th Leg., R.S., ch. 142, § 5, 2001 Tex. Gen. Laws 5020 (eff. June 1, 2003), *as noted in Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225–26 (Tex. 2002); *Smith v. Deneve*, 285 S.W.3d 904, 911 (Tex. App.—Dallas 2009, no pet.)).

William argues that he met his burden of showing a fiduciary or confidential relationship by showing that Linda was romantically involved with Zeke, but evidence of a romantic relationship, even a long-standing one, does not constitute evidence of a fiduciary relationship. *Smith v. Deneve*, 285 S.W.3d 904, 911 (Tex. App.—Dallas 2009, no pet.) (citing *Hubbard v. Shankle*, 138 S.W.3d 474, 479, 483 (Tex. App.—Fort Worth 2004, pet. denied)). This is because "a presumption of fraud or undue influence does not usually apply where confidence is reposed by one in another. Such presumption of fraud properly applies to fiduciary relationships, such as guardian and ward, trustees, etc."[5] *Price v. Taliaferro*, 254 S.W.2d 157, 163 (Tex. Civ. App.—Fort Worth 1952, writ ref'd n.r.e.).

"A confidential fiduciary relationship may exist where influence has been acquired and abused or where confidence has been reposed and betrayed." *Gray*, 428 S.W.3d at 316 (citing *Crim Truck & Tractor*, 823 S.W.2d at 594). "Whether a confidential relationship exists is 'determined from the actualities of the relationship between the persons involved.'" *Id.* (quoting

---

[5]While Zeke had executed a statutory power of attorney for Linda, Linda never exercised that power because Zeke was never incapacitated before his death.

13

*Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962)). "'The problem is one of equity[,]' and the circumstances giving rise to the confidential relationship 'are not subject to hard and fast lines.'" *Id.* (quoting *Tex. Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 508 (Tex. 1980)). "Factors include whether the plaintiff relied on the defendant for support, the plaintiff's advanced age and poor health, and evidence of the plaintiff's trust." *Id.* (citing *Trostle v. Trostle*, 77 S.W.3d 908, 914–15 (Tex. App.—Amarillo 2002, no pet.)).

The evidence showed that Zeke relied on Linda, loved her, and trusted her in his advanced age. While the evidence showed that Linda handled Zeke's personal and professional financial transactions, it also showed that Zeke was in good mental health until his death. Given these conflicting factors, William argues that, after he raised a genuine issue of material fact on the existence of a fiduciary or confidential relationship, the burden shifted to Linda to produce evidence showing an absence of undue influence. This argument is supported in part by several of our sister courts who have found that "a will contestant may raise a presumption of undue influence by introducing evidence of a fiduciary relationship between the testator and the will proponent." *Estate of Danford*, 550 S.W.3d 275, 281–82 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *see In re Estate of Pilkilton*, No. 05-11-00246-CV, 2013 WL 485773, at *11 (Tex. App.—Dallas Feb. 6, 2013, no pet.) (mem. op.); *Quiroga v. Mannelli*, No. 01-09-00315-CV, 2011 WL 944399, at *5 (Tex. App.—Houston [1st Dist.] Mar. 17, 2011, no pet.) (mem. op.); *Estate of Coleman*, 360 S.W.3d at 611; *Buckner v. Buckner*, 815 S.W.2d 877, 879–81 (Tex. App.—Tyler 1991, no writ); *Price v. Taliaferro*, 254 S.W.2d 157, 163 (Tex. Civ. App.—Fort Worth 1952, writ ref'd n.r.e.); *Rounds v. Coleman*, 189 S.W. 1086, 1089 (Tex. Civ. App.—Amarillo 1916, no writ));

14

*see also Fielding v. Tullos*, No. 09-17-00203-CV, 2018 WL 4138971, at *7 (Tex. App.—Beaumont Aug. 30, 2018, no pet.) (mem. op.). This Court has not expressly applied this presumption in the context of a will contest, though we have recognized that "Texas appellate courts have held that when a fiduciary transacts with the principle [sic] or accepts a gift or bequest from the principal, a burden is placed on the fiduciary to demonstrate the fairness of the transaction." *Gray*, 428 S.W.3d at 317. Nevertheless, the presumption is rebuttable. *Fielding*, 2018 WL 4138971, at *7. "Once evidence contradicting the presumption has been offered, the presumption is extinguished," and "[t]he case then proceeds as if no presumption ever existed." *Id.*

In other words, the rebuttable presumption shifts only the burden of production and "does not shift the ultimate burden of proof." *Id.*; *see In re Willenbrock's Estate*, 603 S.W.2d 348, 351 (Tex. Civ. App.—Eastland 1980, writ ref'd n.r.e.) (Because "a beneficiary under a will [commonly] occupies a close . . . relationship with the testator or testatrix . . . , a confidential or fiduciary relationship frequently exists, but this is no proof of undue influence." Therefore, "the fact that [someone] occupie[s] a fiduciary [or confidential] relationship with the testat[or], standing alone, [i]s insufficient to raise an issue that the will was executed as the result of undue influence."). Contrary to William's argument, even assuming he met his burden to show sufficient evidence to raise the presumption, the undisputed evidence from Branch and others showing that

15

Zeke was strong-willed and of sound mind when the 2010 will was executed extinguished any presumption resulting from Zeke and Linda's relationship.[6]

As a result, we now turn to the evidence relevant in determining whether William met his burden to present more than a scintilla of evidence on the issue of undue influence. In analyzing whether a will should be set aside for undue influence, courts consider

> the relationship existing between the testator and the parties, the opportunities for an exertion or deception, the words or acts of the parties, the mental or physical incapacity to resist or susceptibility to influence, the circumstances surrounding the drafting and execution of the will, the existence of a fraudulent motive, and any domination or habitual control of the testator by another.

*Fisher*, 2014 WL 5465869, at *2 (citing *In re Estate of Reno*, No. 06-09-00040-CV, 2009 WL 4877542, at *5 (Tex. App.—Texarkana Dec.18, 2009, no pet.) (mem.op.) (citing *Rothermel*, 369 S.W.2d at 923)).

"Undue influence implies the existence of a testamentary capacity subjected to and controlled by a dominant influence or power." *Id.* at *6 (quoting *Rothermel*, 369 S.W.2d at 922). The Texas Supreme Court wrote in *Rothermel v. Duncan*,

> The exertion of influence that was or became undue is usually a subtle thing and by its very nature usually involves an extended course of dealings and circumstances. Thus, it is settled that the elements establishing undue influence may be proved by what is known as circumstantial, as well as by direct, evidence. In the absence of direct evidence[,] all of the circumstances shown or established by the evidence should be considered; and even though none of the circumstances standing alone would be sufficient to show the elements of undue influence, if when considered together they produce a reasonable belief that an influence was exerted that subverted or overpowered the mind of the testator and resulted in the execution of the testament in controversy, the evidence is sufficient to sustain such conclusion. However, the circumstances relied on as establishing the elements of undue

---

[6]*See In re Estate of Ward*, No. 04-04-00417-CV, 2005 WL 418551, at *2 (Tex. App.—San Antonio Feb. 23, 2005, pet. denied) (discussing facts showing will proponent was entitled to traditional motion for summary judgment based on conclusive proof of absence of subverting or overpowering influence.)

influence must be of a reasonably satisfactory and convincing character, and they must not be equally consistent with the absence of the exercise of such influence. This is so because a solemn testament executed under the formalities required by law by one mentally capable of executing it should not be set aside on a bare suspicion of wrongdoing.

*Rothermel v. Duncan*, 369 S.W.2d 917, 922–23 (Tex. 1963) (citations omitted).

"The exertion of undue influence cannot be inferred by opportunity alone." *See Fisher*, 2014 WL 5465869, at *7 (citing *In re Estate of Ross*, No. 10-10-00189-CV, 2011 WL 6004336, at *6 (Tex. App.—Waco Nov. 30, 2011, no pet.) (mem. op.) (citing *Cotten v. Cotten*, 169 S.W.3d 824, 827 (Tex. App.—Dallas 2005, pet. denied))). Thus, evidence that Linda cared for Zeke, lived with him, took his messages, and handled financial matters at Zeke's direction "is no evidence of the existence and exertion of undue influence because such contacts are 'equally consistent with the theory of innocence as . . . with the theory of wrongdoing.'" *See id.* (quoting *Ross*, 2011 WL 6004336, at *6); *see Birmingham-Queen v. Whitmire*, No. 04-05-00646-CV, 2006 WL 1539587, at *5 (Tex. App.—San Antonio June 7, 2006, no pet.) (mem. op.) (evidence that Bessie was the decedent's caretaker, was always in close contact with him, refused to leave him alone with others, and attempted to isolate him from his family and friends "only illustrate[s] that Bessie had opportunity to unduly influence [the decedent]; [it is] not proof that she actually exerted influence over him."). Likewise, evidence showing that Zeke was old and suffered the common maladies of age demonstrates only opportunity to exert influence, not the actual influence of his mind by Linda at the time he executed the 2010 will. *See Rothermel*, 369 S.W.2d 917; *Fisher*, 2014 WL 5465869, at *7 (citing *Davis*, 9 S.W.3d at 293; *Guthrie v. Suiter*, 934 S.W.2d 820, 832 (Tex. App.—Houston

[1st Dist.] 1996, no writ)).  The more important inquiry is whether Linda took advantage of opportunities to unduly influence Zeke.  *See Rothermel*, 369 S.W.2d at 923.

Here, there was evidence showing that Linda had some influence over Zeke in light of Zeke's loans or gifts to Ryan, conflicting testimony about statements Zeke made after the 2010 will regarding who he wished to leave his estate to, and testimony that Linda had her "talons" in Zeke. "However, '[i]t cannot be said that every influence exerted by one person on the will of another is undue, for the influence is not undue unless the free agency of the testator was destroyed and a testament produced that expresses the will [of] the one exerting the influence.'"  *Fisher*, 2014 WL 5465869, at *9 (first alteration in original) (quoting *Rothermel*, 369 S.W.2d at 922). While there arguably was evidence showing that Linda pushed Zeke to make a will, no evidence suggested that the 2010 will contained a disposition that was against Zeke's wishes when he executed it.  There was no evidence that Linda was pushing Zeke to name her independent executrix or list her as the 2010 will's sole beneficiary or that Linda tricked Zeke in any way in the making of the 2010 will.  *See id.* at *8 (citing *Steed*, 152 S.W.3d at 809 (discussing what constitutes evidence of fraudulent motive to support claim of undue influence)).[7]

"Undue influence 'must be proved to have been exercised in relation to the . . . will itself and not merely in other transactions.  Mere persuasions, entreaties, or mere suspicion of undue influence will not invalidate . . . a will on such grounds.'"  *Id.* (quoting *Griffin v. Griffin*, 271 S.W.2d 714, 719 (Tex. Civ. App.—Texarkana 1954, no writ); *see In re Estate of Graham*, 69

---

[7]"In fact, 'one may request or even importune and entreat another to execute a favorable dispositive instrument; but unless the importunities and entreaties are shown to be so excessive as to subvert the will of the maker, they will not taint the validity of the instrument with undue influence.'"  *Fisher*, 2014 WL 5465869, at *8 (quoting *Rothermel*, 369 S.W.2d at 922).

S.W.3d 598, 610 (Tex. App.—Corpus Christi 2001, no pet.)). "Thus, evidence that another influenced a testator, by 'dominat[ing] him, including handling all [of the testator's] financial affairs, being the "boss," and running the whole show' is legally insufficient to invalidate a will in the absence of evidence that undue influence 'was specifically exerted on the testamentary act.'" *Id.* (quoting *Steed*, 152 S.W.3d at 809 (alteration in original) (citing *Griffin*, 271 S.W.2d 714)).

In order to defeat Linda's no-evidence summary judgment motion, William was required to introduce evidence showing that Linda's "undue influence subverted or overpowered the mind of the testator *at the time of execution of the instrument.*" *See id.* (citing *Steed*, 152 S.W.3d at 807; *Rothermel*, 369 S.W.2d at 922). William, George, and the witnesses supporting their position had no knowledge regarding the specific circumstances surrounding the execution of Zeke's will, except for Linda's undisputed statement that she copied Zeke's notes to Branch, word for word, before Zeke's meeting with Branch. Importantly, it was uncontested that the 2010 will was prepared by Branch after he met with Zeke alone, determined him to be "strong-willed" and of sound mind, and heard Zeke's wishes directly from Zeke. Branch also stated that Zeke returned alone to execute the 2010 will in accordance with the formalities of Texas law in front of neutral witnesses. Simply put, William introduced no evidence that Zeke's mind was subverted or overpowered at the time Zeke executed the 2010 will.

Also, William was required to present evidence that Zeke "executed a will that he would not have executed but for the influence exerted on him." *See id.* at *9 (citing *Steed*, 152 S.W.3d at 807). "The establishment of this element of undue influence 'is generally predicated on an assessment of whether the testament provides for an unnatural disposition of the property.'" *Id.*

19

(citing *Davis*, 9 S.W.3d at 294). The 1995 will, penned entirely in Zeke's handwriting, informed the question of Zeke's intent and showed that he wished to leave his estate to Linda, at least at that time, while making Ryan the contingent beneficiary. There was no evidence of undue influence with respect to the 1995 will, and nothing contradicted Linda's testimony that she had not seen the 1995 will when the 2010 will was executed. While Zeke entirely disinherited his brothers and other family members in the 2010 will instead of leaving them $1.00 as he had done in the 1995 will, the 2010 will was in large part a reflection of the 1995 will. Moreover, the evidence showed that Zeke had no relationship with William in 2010, that his relationship with George, if any, was strained, and that Linda was Zeke's lifelong companion. Even Perry testified that the 2010 will was executed at a time when Zeke had only Linda and Ryan in his life. In short, there was no evidence showing that the 2010 will was the result of undue influence.

At best, William's arguments and evidence produce merely a conjured suspicion of undue influence. A "will 'executed under the formalities required by law by one mentally capable of executing it should not be set aside on a bare suspicion of wrongdoing.'" *Id.* at *9 (quoting *Mackie v. McKenzie*, 900 S.W.2d 445, 451 (Tex. App.—Texarkana 1995, writ denied)). We find that the trial court properly found for Linda on the issue of undue influence in her no-evidence summary judgment motion. As a result, we overrule this contention by William.

*(2)    The Summary-Judgment Evidence Raised No Fact Issue Regarding Revocation*

William also argues that Linda's summary judgment was improper, because the trial court erred in finding no evidence that the 2010 will was revoked. The Texas Estates Code provides,

> A written will, or a clause or devise in a written will, may not be revoked, except by a subsequent will, codicil, or declaration in writing that is executed with like

20

formalities, or by the testator destroying or canceling the same, or causing it to be destroyed or canceled in the testator's presence.

TEX. EST. CODE ANN. § 253.002. Because the 2010 will was not destroyed, William had to show that it was revoked by a subsequent testamentary document "executed with like formalities." *See id.*

In response to Linda's no-evidence motion for summary judgment on his revocation claim, William bore the burden to present evidence of the revocation of the 2010 will. *See Lisby v. Richardson's Estate*, 623 S.W.2d 448, 449–50 (Tex. App.—Texarkana 1981, no pet.); *Covington v. McDonald*, 307 S.W.2d 335, 337 (Tex. App.—Texarkana 1957, no pet.). To meet his obligation, William had to present evidence that, after the 2010 will, Zeke executed some "instrument with the formalities and under the circumstances required by the probate code for valid wills, which instrument expressly or impliedly revokes the former will." *See Lisby*, 623 S.W.2d at 450. While the revoking document need not be produced, "execution meeting such requirements may be proved by any competent, relevant, and probative evidence sufficient to establish the facts." *Id.* at 451 (citing *May v. Brown*, 190 S.W.2d 715 (1945)).

For example, in *Lisby*, an attorney testified that he drafted a will revoking all prior wills, including the probated will. *Id.* at 450. The attorney said the new will was signed by the decedent, was self-proved, and was witnessed and notarized. *Id.* In *May*, there was evidence that the decedent executed a new will in his own handwriting and asked two employees to sign the will as witnesses. *May*, 190 S.W.2d at 717–18. Before executing the new will, which made his son executor, he asked his attorneys if he could make a handwritten will. *Id.* The decedent's son was sent to the decedent's office to retrieve the will, but the son said he could not find it. *Id.* This was

21

contradicted by witnesses who said that they saw the son carrying a tin box under his arm which purportedly contained the new will. *Id. May* found that there was a fact issue on revocation.

In both *Lisby* and *May*, there was evidence that disinterested witnesses had seen the decedent execute a new will. Here, there was no such evidence. At best, the evidence showed that Zeke had promised land to others, told others that Linda was only getting a portion of his estate, and told Perry that he had made a new will. Coupled with evidence that the filing cabinet moved by Linda could have contained a new will, William argues that a fact issue was established.

However, bare testimony that a decedent made a new will is insufficient to raise a fact issue of revocation where there was no evidence that anyone saw or witnessed the new will. *See Estate of Hamner*, No. 09-13-00218-CV, 2015 WL 474274, at *1 (Tex. App.—Beaumont Feb. 5, 2015, no pet.) (mem. op.). This is because such evidence that the decedent may have executed a new will is mere suspicion requiring the fact-finder "to stack inference on inference" and amounts to no evidence that a later will was executed with the formalities required by the Texas Estates Code. *Id.* at *3–4; *see Betts v. Betts*, 395 S.W.2d 673, 675 (Tex. App.—Amarillo 1965, no pet.) (holding that the naked statement in an affidavit that the testator told the affiant he had made a new will giving all his property to a third party, unsupported by any other proof of revocation of the probated will constituted no probative evidence of revocation.); *Covington*, 307 S.W.2d at 338 (testimony "concerning statements by the testator that he was making a will, that he might do this or that, or that he had revoked his old will, does not amount to a revocation of his will or the changing [of] any of its provisions").

There is, in this record, no evidence of personal knowledge of the existence of a will executed after the 2010 will, or of any statement from which such inference could be drawn. "The record is completely silent as to any such will having been made under the solemnities required by law for a will and the alleged statement of the deceased is simply a statement of a legal conclusion as distinguished from a statement of facts from which that conclusion should be deduced." *See Betts*, 395 S.W.2d at 675. Because William's evidence was insufficient to raise a fact-issue on his claim of revocation, summary judgment was not improper on that basis. We overrule this contention of error.

*(3)     Denying William's Requested Continuance to Conduct Further Discovery Was Within the Trial Court's Discretion*

William also argues that the trial court erred in denying his motion for continuance. "A trial court's ruling on a motion for continuance is reviewed for a clear abuse of discretion." *Antolik v. Antolik*, No. 06-18-00096-CV, 2019 WL 2119646, at *6 (Tex. App.—Texarkana May 15, 2019, pet. denied) (citing *Pjetrovic v. Home Depot*, 411 S.W.3d 639, 644 (Tex. App.—Texarkana 2013, no pet.); *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002)). "A trial court 'abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law.'" *Id.* (quoting *Marchand*, 83 S.W.3d at 800). "Rule 251 provides that a continuance shall not 'be granted except for good cause supported by affidavit.'" *Hartwell v. Lone Star, PCA*, 528 S.W.3d 750, 757 (Tex. App.—Texarkana 2017, pet. dism'd) (citing TEX. R. CIV. P. 251).

After Linda had filed her no-evidence motion for summary judgment, William moved for a continuance to conduct further discovery. "A party may move for summary judgment on no-

23

evidence grounds only "[a]fter adequate time for discovery." *Pineda REO, LLC v. Lomix Ltd. P'ship*, No. 13-17-00277-CV, 2019 WL 5799990, at \*13 (Tex. App.—Corpus Christi Nov. 7, 2019, no pet. h.) (mem. op.) (quoting TEX. R. CIV. P. 166a(i)). "A discovery period set by pretrial order should be adequate opportunity for discovery unless there is a showing to the contrary, and ordinarily a [no-evidence] motion . . . would be permitted after the period but not before." TEX. R. CIV. P. 166a(i) cmt. The rule on summary judgment "clearly contemplates that the trial court will allow the parties a reasonable opportunity to conduct discovery before granting summary judgment . . . allow[ing] parties to obtain the fullest knowledge of facts and issues before the disposition of their case." *Howard v. E. Tex. Baptist Univ.*, 122 S.W.3d 407, 413 (Tex. App.—Texarkana 2003, no pet.) (quoting *Levinthal v. Kelsey-Seybold Clinic, P.A.*, 902 S.W.2d 508, 512 (Tex. App.—Houston [1st Dist.] 1994, no writ)). A continuance of a summary judgment hearing for time to conduct further discovery can be granted when supported by affidavit that, without it, the nonmovant "cannot for reasons stated present by affidavit facts essential to justify his opposition" to the summary judgment. *Pineda REO, LLC*, 2019 WL 5799990, at \*13 (quoting TEX. R. CIV. P. 166a(g); *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004)).

"The question of whether a nonmovant has had adequate time to conduct discovery is decided on a case-by-case basis." *Howard*, 122 S.W.3d at 413 (citing *McClure v. Attebury*, 20 S.W.3d 722, 729 (Tex. App.—Amarillo 1999, no pet.)). In making this determination, courts may consider various factors, including "the length of time the case has been on file, the materiality and purpose of the discovery sought, and whether the party seeking the continuance has exercised due diligence to obtain the discovery sought." *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d

24

150, 161 (Tex. 2004). The trial court may consider the entire procedural history of the case. *Howard*, 122 S.W.3d at 414 (quoting *GeoChem Tech Corp. v. Verseckes*, 929 S.W.2d 85, 90 (Tex. App.—Eastland 1996), *rev'd on other grounds*, 962 S.W.2d 541 (Tex. 1998)).

Linda's application to probate the 2010 will was filed March 10, 2018, prompting William's April 20 opposition and request for disclosure from Linda. When, as here, a suit is not governed by a Level I or Level III discovery control plan, discovery must be conducted in accordance with a Level II discovery plan. TEX. R. CIV. P. 190.3(a). As applicable, Rule 190.3 states that discovery ends "nine months after the earlier of the date of the first oral deposition or the due date of the first response to written discovery." TEX. R. CIV. P. 190.3(b)(1)(B)(ii). Thus, discovery in this case ended on February 20, 2019, nine months after the May 20 deadline to respond to William's requests for disclosure.

In her January 15, 2019, deposition, Linda identified several of Zeke's friends and amended her discovery responses on January 25 to list those friends and Ryan as persons with knowledge of relevant facts. Linda's summary judgment was filed on February 8. When the discovery period ended on February 20, the trial court sent notice of the March 27 summary judgment hearing. Immediately after that hearing was set on February 20, William amended his opposition to probate the 2010 will to include a request that discovery be conducted in accordance with a Level III discovery control plan. On March 11, William sent a notice of intent to take Ryan's deposition by written questions stating Ryan's responses were due on or before April 3, a date after the scheduled summary judgment hearing.

On March 20, 2019, William filed a verified motion for continuance along with his response to Linda's summary judgment motion, which prayed for the trial court to grant Level III discovery to extend the discovery period. William argued that Linda had listed Zeke's friends and Ryan as people with knowledge of relevant facts for the first time on January 25 and that Ryan's outstanding deposition on written questions was necessary and relevant on the issue of undue influence.

Linda moved to quash Ryan's deposition because the Level II discovery period had ended and William had failed to depose Ryan earlier, even though George's August 6, 2018, discovery responses had listed Ryan as a person with knowledge of relevant facts. William failed to seek discovery from any of Zeke's friends, even though there were twenty-five days between the time Linda amended her discovery responses and the Level II discovery deadline. The trial court denied William's motion for continuance.

William moved to modify the discovery control plan to Level III on the deadline for Level II discovery. A case can be designated as Level III only by court order. *Allen v. United of Omaha Life Ins. Co.*, 236 S.W.3d 315, 326 (Tex. App.—Fort Worth 2007, pet. denied). Rule 190.4 states that the "court must, on a party's motion . . . order that discovery be conducted in accordance with a discovery control plan tailored to the circumstances of the specific suit." TEX. R. CIV. P. 190.4(a). Yet, Rule 190.4 does not automatically set deadlines different from Level II deadlines, because they remain under Level III "unless specifically changed in the discovery control plan ordered by the court." *Border States Elec. Supply of Tex., Inc. v. Coast to Coast Elec., LLC*, No. 13-13-00118-CV, 2014 WL 3953961, at \*12 (Tex. App.—Corpus Christi May 29, 2014, pet. denied) (mem. op.)

26

(quoting *Allen*, 236 S.W.3d at 327 (quoting TEX. R. CIV. P. 190.4(b)); *see Brescia v. Slack & Davis, L.L.P.*, No. 03-08-00042-CV, 2010 WL 4670322, at *3 (Tex. App.—Austin Nov. 19, 2010, pet. denied) (mem. op.); *Mulcahy v. Wal-Mart Stores, Inc.*, No. 02-10-00074-CV, 2010 WL 5118199, at *2 (Tex. App.—Fort Worth Dec. 16, 2010, no pet.) (mem. op.).

Although William sought a change to Level III discovery on the day Level II discovery ended, William never secured a court order for Level III discovery. As a result, his motion for continuance was filed a month after the discovery deadline had passed. Under Rule 190.5, a court must allow for modification of a discovery control plan to allow discovery

> (a)     related to new, amended or supplemental pleadings, or new information disclosed in a discovery response or in an amended or supplemental response, if:

> (1)     the pleadings or responses were made after the deadline for completion of discovery or so nearly before that deadline that an adverse party does not have an adequate opportunity to conduct discovery related to the new matters, and

> (2)     the adverse party would be unfairly prejudiced without such additional discovery.

TEX. R. CIV. P. 190.5.

In July 2018, William claimed Linda had isolated Zeke from friends, but did not specifically ask Linda who Zeke's friends were until her January 15 deposition. Linda identified Zeke's friends in response to questions by William seeking to establish his claim. William had knowledge of Zeke's friends five weeks before the discovery deadline, and Linda's amended responses were filed twenty-five days before the discovery deadline. Yet, no discovery requests were sent to Zeke's friends, and the motion for continuance generally argued that depositions were

27

required "in order to more fully discover the witness's connection and relevant knowledge of the claims in this case." The trial court could have concluded that William had been afforded adequate time to conduct discovery related to those friends or that discovery on the issue of alleged isolation had no bearing on the question of whether Zeke was unduly influenced by Linda at the time he executed the 2010 will in Branch's office.

As for Ryan, the trial court could have concluded that William should have deposed Ryan earlier since George had identified him in discovery responses filed in August 2018. Linda also stated in her responses to interrogatories filed in September 2018 that Ryan had received loans and gifts from Zeke. In spite of this knowledge, William waited until after the discovery period ended to depose Ryan. "A litigant's failure to diligently pursue discovery will not authorize the granting of a continuance." *Howard*, 122 S.W.3d at 413 (citing *State v. Wood Oil Distrib., Inc.*, 751 S.W.2d 863, 865 (Tex. 1988)).

Here, William waited until a month after the summary judgment hearing was set and the discovery period ended to file his motion for continuance. Under the circumstances discussed above, we cannot say that the trial court abused its discretion in finding that William had been afforded a reasonable opportunity to conduct discovery or was not unfairly prejudiced without additional discovery.

We affirm the trial court's judgment.

                                    Josh R. Morriss, III
                                    Chief Justice

Date Submitted:      December 3, 2019
Date Decided:        January 23, 2020